IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. SMITH, | No. C 05-3822 JSW (PR) |
|     Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |
| vs. | |
| D. L. RUNNELS, Warden, | |
|     Respondent. | |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

An Alameda County jury convicted Petitioner of assault with a firearm and of being a felon in possession of a firearm. Enhancement allegations that Petitioner personally used a firearm and inflicted great bodily injury on the victim were found true. Because Petitioner had previously been convicted of three serious felonies, he received a three-strikes sentence of forty-five years to life.

The California Court of Appeal affirmed Petitioner's conviction and sentence, and the Supreme Court of California denied his petition for review.

Petitioner conceded in his first amended petition that he had not exhausted two of the four issues he sought to raise. Upon being notified of his options by the Court, he elected to ask

for a stay to allow him to return to state court to exhaust the unexhausted issues. The stay was granted and the case was administratively closed. Upon notification from Petitioner that he had completed exhaustion the court reopened the case.

Petitioner does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

> On July 16, 2000, between 4:00 and 5:00 a.m., Lewis Davis was standing in the lobby of the apartment building in which he lived. He had approximately eight dollars in his hand. As he conversed with a woman, Davis became aware that someone was watching him. He recognized the person as appellant, a person Davis had "seen ... around" three or four times a week for two or three months. Appellant asked Davis whose money was in his hand. Davis replied that it was his own money.
>
> At that point, Davis noticed that appellant was holding a dark automatic pistol in his right hand, down at his side but pointed slightly up at an angle. When he saw the gun, Davis began backing up through the lobby into the narrow hallway leading toward the rear of the building. Appellant followed as he did so, taking a step forward for each of Davis's steps backward, and coming to about three feet of Davis. Appellant continued to hold the gun at his side.
>
> After about 15 steps, Davis reached apartment number two, the apartment of his friend Ronnie Howard. Knowing that appellant and Howard were also friends, appellant loudly began calling out Howard's name, and asked Howard to come out and talk with appellant. Through the door, Howard said: "Lewis, what's going on?" Howard started to open the door of his apartment, but appellant used his own foot to block the door from opening into the hallway. Howard continued pushing on the door, and after about a minute, it came off its hinges. Howard came out into the hallway and stood between appellant and Davis. There was a curtain hanging in Howard's doorway. While Howard talked with appellant, Davis backed two or three feet into Howard's apartment, as Howard kept the curtain hanging in his doorway pulled back to the side. Davis had a full view of appellant.
>
> Howard asked appellant several times to leave. When appellant failed to leave, Howard said he was going to call the police. There was a pay telephone across the hall from Howard's apartment. As Howard moved into the hallway, the curtain fell forward, blocking Davis's view of appellant. Almost immediately thereafter, Davis saw the gun appellant was holding come through the space between the edge of the curtain and the door frame. Davis heard a shot. Howard's girlfriend Rosella Flemings, who was sitting on the bed in the room, screamed. At first, Davis thought she had been shot. When he patted his shoulder, however, he felt blood, and began to feel pain. Davis stepped into the hallway. He did not see appellant. Howard said, "[M]an, you been shot." Davis felt faint, and began to collapse against the wall. The police were called. When they arrived, Davis told them that he had been shot by appellant, whom he identified as "Michael Joe." The bullet broke Davis's collar bone. His arm was in a sling for five or six weeks, and he was unable to use his arm for three or four months.
>
> Oakland Police Officer D'vour Thurston responded to the scene of the shooting at approximately 5:00 a.m. on July 16, 2000. Officer Thurston found

Davis lying in the hallway of the apartment building, holding his shoulder and screaming that he had been shot. There was blood on Davis's shirt; a large amount of blood was starting to pool around his body. Davis told Officer Thurston that he had been shot by a man named "Michael Joe," whom Davis had known "for quite some time." Davis had just been arguing with appellant about some money, when appellant produced a firearm and shot him. Davis described the assailant as a dark-complected black man, approximately 35 to 40 years of age.

Oakland Police Sergeant Gregory Bingham spoke with Howard at approximately 10:30 a.m. on July 16, 2000. Howard told Sergeant Bingham that he was acquainted with the shooter, who Howard identified as "Michael Joe." Sergeant Bingham prepared a photographic lineup with six photographs and showed it to Howard, telling him that the police did not know if the assailant's picture was included, and that Howard was under no obligation to identify anyone from the lineup. Howard unhesitatingly identified appellant from the lineup of six photographs, and he signed the back of the photograph of appellant. Sergeant Bingham also spoke with Davis at the hospital where he was being treated for his gun shot wound. Davis told Sergeant Bingham that he had been shot by "Michael Joe," whom Davis said he knew from the area. Like Howard, Davis selected appellant's photograph from the lineup without any hesitation.

Notwithstanding his statements to the police immediately after the incident identifying appellant as the shooter, and his preliminary hearing testimony consistent with those earlier statements, Howard testified at trial that he had gone to sleep drunk the night before the incident and was too "inebriated" at the time of the shooting to say what happened. According to Howard's trial testimony, he was in a drunken "fog," and his "perception was off"; the hallway was dark; there were "quite a few" people in the hallway when he came to the door; he could not remember where appellant was at the time; and he "couldn't say" that his prior statements and testimony about the incident had been truthful.

Howard admitted that since the time of the shooting, he had been arrested and had pleaded no contest to charges involving the sale of drugs; and that he felt he had been unfairly treated both by the officer who arrested him and by the judicial system. Howard's claimed failure to recollect the events of July 16, 2000, was impeached by his preliminary hearing testimony, in which he stated that he forced his apartment door open to find appellant standing in the hall with a gun; he repeatedly told appellant to leave; appellant fired his gun into Howard's apartment; and afterwards, appellant ran back down the hallway and out the door. In addition, Howard admitted that on July 31, 2000, two weeks after the shooting, he saw his girlfriend Flemings with a cut above her eye. After Howard said he could not recall seeing appellant at that time, the prosecutor played a tape recorded statement by Howard to the police in which he stated that shortly after his girlfriend got the cut above her eye, he had seen appellant coming towards him across the street pulling out a gun.

Like Howard, Flemings also testified at trial that she could not remember what happened on the morning of July 16, 2000. However, Flemings did acknowledge that appellant struck her on July 31, 2000, causing her to sustain a cut above her eyebrow. The prosecutor played a tape recorded statement in which Flemings stated that when he hit her, appellant said "bitch about to tell," or similar words.

After Davis and Howard had identified appellant as the assailant, Sergeant Bingham broadcast appellant's name and description over the police radio and

3

distributed his photograph in a police informational bulletin. On August 12, 2000, at approximately 11:30 p.m., Officer Anthony Caldwell went to the corner of Holly Street and 87th Avenue in response to a dispatch call stating that appellant had been seen in that area. Officer Caldwell saw appellant standing at the southeast corner of 87th and Holly. Another officer in a marked patrol car who was also responding drove slowly by appellant and called out his name. Appellant immediately looked at the officer, and then ran "[v]ery fast" in a northbound direction. Officer Caldwell pursued appellant in his patrol car. Appellant looked back at the pursuing police vehicle three or four times while continuing to run at a high rate of speed. Appellant kept his right hand "tucked into his jacket."

When appellant turned to run into the yards between private residences, Officer Caldwell left his vehicle and pursued appellant on foot. The officer lost sight of appellant after he jumped over several fences. With the assistance of other police officers, Officer Caldwell established a one-block perimeter around the area to prevent appellant's escape. Approximately 20 to 25 minutes later, one of the officers on the perimeter apprehended appellant. Appellant was sweating and out of breath, was not wearing the red jacket and shirt he had been wearing when Officer Caldwell first saw him. Despite a search of the area, the police failed to recover the jacket or the shirt appellant had been wearing when first seen; nor did they recover any gun.

(Ex. 4 at 1-3.)

## EVIDENTIARY HEARING

Petitioner asks for an evidentiary hearing in his traverse.

An evidentiary hearing is held in federal habeas cases only under the most limited circumstances. *Baja v. Ducharme*, 187 F.3d 1075, 1077-79 (9th Cir. 1999). An evidentiary hearing on a claim for which the Petitioner failed to develop a factual basis in state court can be held only if Petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2)(A)-(B). In short, if Petitioner did not attempt to present in state court the facts he wishes to present now, for instance by attempting to develop them in his state habeas proceedings, he cannot do so now unless he can show that he meets the provisions of section 2254(e)(2) outlined above.

A prisoner "fails" to develop the factual basis of a claim, triggering § 2254(e)(2), if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's

4

counsel." *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Accordingly, where the prisoner has met the burden of showing he was diligent in efforts to develop the facts supporting his claims in state court, an evidentiary hearing may be held without regard to whether the "stringent" requirements of § 2254(e)(2) apply. *Id.* at 437; *Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

It is Petitioner's burden to show that he attempted to develop the facts in state court but was prevented from doing so, for instance by showing that the state court denied a request for an evidentiary hearing. *Hutchison v. Bell*, 303 F.3d 720, 747 (6th Cir. 2002) (requiring Petitioner to demonstrate "sufficient diligence"); *Baja,* 187 F.3d at 1078-79.

Petitioner has not presented any information showing that he acted with due diligence in attempting to develop the facts in state court, whether by requesting an evidentiary hearing in state court or submitting declarations there. He thus has failed to develop facts in state court, and because he has not attempted to show that the exceptions of Section 2254(e)(2)(A)-(B) apply to him, is not entitled to an evidentiary hearing.

Furthermore, Petitioner provides no allegations of what he would expect to show if a hearing were to be held. Thus, even if he had not failed to show that he attempted to develop the facts in state court and was prevented from doing so, he has not shown an entitlement to an evidentiary hearing under the pre-AEDPA standard. *See Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir. 1995) (to establish right to evidentiary hearing, Petitioner must provide allegations of fact that, if proven, would establish right to relief).

The motion for an evidentiary hearing will be denied.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**DISCUSSION**

A major problem with this case is determining what issues should be addressed. In his first amended petition, Petitioner asserted as grounds for relief that: (1) there was insufficient

6

evidence to support giving a flight instruction; (2) his sentence was cruel and unusual; (3) the prosecutor committed misconduct in referring to Petitioner's status as a felon; and (4) trial counsel was ineffective. The third and fourth issues are those Petitioner conceded to be unexhausted and which triggered the stay to exhaust. This petition the Court determined to be the "operative pleading" in its order staying the case to allow exhaustion.

The second amended petition, filed after the stay for exhaustion, is not on the Court's form for habeas cases, is in a different handwriting than Petitioner's other filings, and is very difficult to understand. It appears, however, that in it Petitioner claims that his counsel was ineffective – possibly the same issue as issue four in the first amended petition – and that his rights under *Cunningham v. California*, 549 U.S. 270 (2007), were violated.

Ordinarily an amended pleading completely replaces the previous pleading, *see Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992), but because Petitioner is pro se, the Court will not treat the second amended petition as completely replacing the first amended petition. Instead, all of the issues presented the amended petitions will be considered.

## I. Flight Instruction

Petitioner contends in the first amended petition that there was insufficient evidence to support giving a flight instruction. This issue was raised on direct appeal, where it was rejected by the court of appeal. That court held that there was evidence to support giving the instruction, both in Petitioner's fleeing the scene at the time of the crime and his attempt to flee the police when he was apprehended about a month later. (Ex. 4 at 8-9.) The victim testified that after shooting him Petitioner disappeared from the scene. (*Id.* at 2-3.) The preliminary hearing testimony of witness Howard that Petitioner fled also was admitted at trial, when Howard changed his story. (*Id.*) Petitioner does not dispute the existence of any of this evidence.

The evidence recited above is more than enough evidence to support giving the instruction. Even assuming for purposes of ruling on this issue that there is a constitutional right not to have a jury instruction given that is not supported by the evidence – something that is by no means evident – this claim is without merit.

///

///

**II.     Sentence**

Petitioner contends that his three-strikes sentence of forty-five years to life is cruel and unusual, a violation of his Eighth Amendment rights.

The Eighth Amendment to the United States Constitution provides that there "shall not be . . . cruel and unusual punishment inflicted." U.S. Const. amend. VIII. "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) ("A gross disproportionality principle is applicable to sentences for terms of years."). The Eighth Amendment does not preclude a state from making a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime, as may occur under a recidivist sentencing statute. *Ewing*, 538 U.S. at 25, 29-30. In determining whether a sentence is grossly disproportionate under a such a statute, the court looks to whether the "extreme sentence is justified by the gravity of [the individual's] most recent offense and criminal history." *Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).

In *Andrade*, the Supreme Court upheld a Three Strikes sentence of two consecutive twenty-five-to-life terms for a recidivist convicted of stealing approximately $150 worth of videotapes. *Andrade*, 538 U.S. at 66, 77. Andrade had a criminal history of petty theft, burglary, and transportation of marijuana. *Id.* at 66. Similarly, in *Ewing*, the Court upheld a Three Strikes sentence of twenty-five years to life for a repeat felon convicted of felony grand theft of three golf clubs worth nearly $1,200. *Ewing*, 538 U.S. at 18-19, 30-31. Ewing had a criminal history of theft, battery, burglary, possession of drug paraphernalia, illegal firearm possession, robbery, and trespass. *Id.* at 18-19. By contrast, the Ninth Circuit in *Ramirez* held that a Three Strikes sentence of twenty-five years to life on petty theft with prior conviction was grossly disproportionate to the crime. *Ramirez*, 365 F.3d at 767. Ramirez's prior criminal

8

history consisted of two convictions for second-degree robbery obtained through a single guilty plea, for which his total sentence was one year in county jail and three years of probation. *Id.* at 768. The robberies were "nonviolent" shoplifting crimes in which the "force" used was when a third party drove the getaway car over the foot of a grocery store security guard and when Ramirez pushed a K-mart security guard out of his way as he fled the store. *Id.*

Here, petitioner was convicted of assault with a firearm and being a felon in possession of a firearm. (Ex. 4 at 1.) He also was found to have personally used a firearm and to have inflicted great bodily injury. Clearly, his offense was much more serious than the thefts in *Andrade* and *Ewing*. In determining whether a sentence is grossly disproportionate under a recidivist sentencing statute, however, courts look not only at the most recent offense, but also at the petitioner's criminal history. *Ramirez*, 365 F.3d at 768.

Unlike in *Ramirez*, where Ramirez's two prior strikes were nonviolent shoplifting crimes, petitioner's record is dramatically more serious: it includes an armed robbery, a random and apparently motiveless voluntary manslaughter, assault with a firearm, convictions for being felon in possession of a firearm and drug offenses, and eight parole revocations. (Ex. 4 at 12.)

Petitioner's offense was more serious than those involved in *Andrade* and *Ewing*, and his record was much worse than either of the defendants in those cases; therefore, since neither sentence in those cases was grossly disproportionate, neither was that imposed on Petitioner. The state courts' rejections of Petitioner's Eighth Amendment claim were neither contrary to, nor unreasonable applications of, clearly established Supreme Court authority.

**III.     Prosecutorial Misconduct**

This is another of Petitioner's issues where it is difficult to ascertain what he is trying to claim.

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). Habeas corpus petitions must meet heightened pleading requirements. *McFarland v. Scott,* 512 U.S. 849, 856 (1994). An application for a federal writ

9

of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court must "specify all the grounds for relief which are available to the petitioner ... and shall set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. "'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970). "Habeas petitions which appear on their face to be legally insufficient are subject to summary dismissal." *Calderon v. United States Dist. Court (Nicolaus)*, 98 F.3d 1102, 1108 (9th Cir. 1996) (Schroeder, J., concurring).

Petitioner phrases this issue, one of those in the first amended complaint, as "Appellant [sic] Was Prejudiced by the Prosecutor's Misconduct." In his "Supporting Facts" for this issue, Petitioner contends that the prosecutor "put[] before the jury inadmissible but highly prejudicial information," but does not say what the information was. (First Amended Petition at (unnumbered) 6b.) He refers to using perjured testimony to obtain a conviction, but does not say that the prosecutor here actually did so, nor does he say what the perjured testimony might be.[1] (*Id.*)

He also asserts that the "accumulation of errors" was a violation of due process, but there is no such thing as cumulative constitutional error, in which errors of less than constitutional dimension cumulate to constitutional error. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

He also contends that the prosecutor committed misconduct by repeatedly referring to the fact that he was a felon, but provides no further facts as to when references to his felon status were made or what the context was. Because one of the charges was being a felon in possession of a firearm, the fact that Petitioner was a felon was of course in evidence, so the simple assertion by Petitioner that the prosecutor referred to that fact, even "repeatedly," is not a sufficient allegation of fact to point to a real possibility of constitutional error. *See People v.*

---

[1] The Court notes that Petitioner also does not supply the missing facts in the second amended complaint or in his traverse.

10

*Valentine*, 42 Cal. 3d 170, 173 (1986) (if defendant stipulates to being a felon, jury must be advised that defendant is an ex-felon, but details of prior offense not admissible).

In short, in this claim Petitioner has not pointed to a real possibility of constitutional error, so the claim is without merit.

### IV.     Ineffective Assistance of Counsel

In the first amended petition, Petitioner contends that trial counsel was ineffective in "failing to conduct an investigation . . . []or . . . interview[] or call pertinent witnesses." He does not say what investigation counsel should have carried out, nor does he say what witnesses should have been interviewed or what they would have said. Under the standard for habeas pleading set out in the section above, this is insufficient to point to a real possibility of constitutional error.[2]

Petitioner also contends that counsel was ineffective in failing to prevent the fact that he is a felon from reaching the jury, either by requesting redactions or stipulating. As noted above, however, that he is a felon is an element of one of the crimes with which he was charged. This claim is without merit.

In the second amended complaint Petitioner contends that counsel was ineffective in some way having to do with "false evidence," and that counsel failed to call alibi witnesses, but never says what that false evidence might have been, who the alibi witnesses were, or what the alibi witnesses would have said. The facts provided about the ineffective assistance claims in the second amended complaint, if indeed they are even intended to be separate claims, are insufficient to state a viable habeas claim.

### V.     *Cunningham* Claim

In the second amended petition, Petitioner contends that his rights under *Cunningham v. California*, 549 U.S. 270 (2007), were violated. In *Cunningham* the Supreme Court announced that the Court's decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum, and that as a result,

---

[2] The Court notes that Petitioner also does not supply the missing facts in the second amended complaint or in his traverse.

California's determinate sentencing law violates the Sixth Amendment because it authorizes the judge, not the jury, to find the facts permitting an upper term sentence.

Petitioner was not given an upper-term sentence on either conviction. (Ex. 1 (clerk's transcript on appeal) at 239). The sentence was made up of the three-strikes sentence of twenty-five years to life, plus a total of twenty years of other sentence enhancements. (*Id.*) *Cunningham* thus does not apply. This claim is without merit.

## VI.  Appealability

The federal rules require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

This was not a close case. For the reasons set out above, jurists of reason would not find the result debatable or wrong. A certificate of appealability will be denied. Petitioner may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a), Rules Governing § 2254 Cases.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED. Petitioner's motion for an evidentiary hearing is DENIED, as is a certificate of appealability. The Clerk shall close the file.

**IT IS SO ORDERED.**

DATED: May 3, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

G:\JSWALL\Pro-Se Prisoner\2005\Smith3822.RUL.wpd

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SMITH,

    Plaintiff,

v.

RUNNELS et al,

    Defendant.

Case Number: CV05-03822 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 3, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Michael Smith
Pleasant Valley State Prison
T55364
P.O. Box 8503
Coalinga, CA 93210

Dated: May 3, 2010

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk